### SNYDER v. MICHIGAN TRACTION CO.

1. SAVING QUESTION FOR REVIEW — DENIAL OF NEW TRIAL — EXCEPTIONS—NECESSITY.

    Where no exception was taken to the refusal to grant a new trial, the assignment of error in overruling the motion has no foundation.

2. CARRIERS—PASSENGERS — PERSONAL INJURIES — NEGLIGENCE — EVIDENCE—SUFFICIENCY.

    In an action by a passenger on an electric car for injuries received in alighting, evidence examined, and *held*, not to establish any negligence on the part of defendant's employés in stopping the car at plaintiff's request.

Error to Calhoun; North, J. Submitted June 16, 1908. (Docket No. 63.) Decided October 5, 1908.

Case by Cornelia Snyder against the Michigan Traction Company for personal injuries. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Homer C. Van Aken* (*William E. Ware*, of counsel), for appellant.

*Sanford W. Ladd*, for appellee.

BLAIR, J.    Plaintiff brought this action to recover damages alleged to have been received in consequence of the negligent failure of the defendant to discharge its duty to safely carry plaintiff, a passenger for hire upon one of its cars, from its station in Battle Creek to its station in Urbandale, "and upon the arrival of the said car at said station at Urbandale to stop the said car there, and give the said plaintiff sufficient time and opportunity to safely and securely alight therefrom to the ground, and to render to her all the assistance reasonably necessary to enable her so to do."    At the close of the testimony for plaintiff, the trial court directed a verdict for defendant, and plaintiff has removed the record to this court for review.

The material facts, as disclosed by the testimony of plaintiff, her husband, and her witnesses, are substantially as follows:    On the evening of October 8th plaintiff and her husband boarded one of defendant's westbound cars with tickets for Urbandale, where they resided. Mrs. Snyder was 59 years of age, and had ridden on the same line before two or three times a week.    There was nothing the matter with her before the accident.

"I was a strong woman, and did all the housework at our home on the farm where we lived before we moved to Urbandale.    Before the accident, my health was very fair."

Plaintiff and her husband occupied a seat in the front end of the car.    When the car arrived at Urbandale it stopped, and plaintiff and her husband arose and started for the rear of the car to alight therefrom.    As they reached the middle of the car, it suddenly started, and jerked them back, and then forward.

"*Q.* And then what immediately happened?    What did you do?

"*A.* Why, walked along to the rear door.

"*Q.* Walked along toward the rear door, is that what you said?

"*A.* Yes, sir.

"*Q.* As you got up toward the rear door and at the rear door, did you see the conductor?

"*A.* Yes, sir.

"*Q.* Where was he?

"*A.* He stood right by the door, so that he could reach up to the bell rope. The conductor was facing me. He was right near me about 2 or 2½ feet. The last I knew he reached up as though he was going to reach for the bell rope.

"*Q.* As you got up there just at that time, did you say anything to the conductor?

"*A.* I asked him if he wasn't going to let us off.

"*Q.* Did he reply?

"*A.* 'Yes,' he said.

"*Q.* What happened right then?

"*A.* Well, the last I knew I laid on the ground.

"*Q.* Off the car do you mean?

"*A.* Yes, sir.

"*Q.* Did you jump off from the car?

"*A.* No, sir.

"*Q.* How did you happen to get off from the car?

"*A.* The jerk, I thought, the jerk of the car, the sway of the car when he reached up—just after he reached up to the bell rope.

"*Q.* What, if anything, did you do to prevent going off the car at that time or attempt to do to save yourself from going off?

"*A.* I went to catch for the handle.

"*Q.* Where is that handle?

"*A.* Right on the cars as we step down.

"*Q.* Did you catch it?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Why, they jerked me.

"*Q.* You say they jerked you? Who jerked you?

"*A.* The car.

"*Q.* Did the conductor touch you?

"*A.* No, sir.

"*Q.* Did you touch the conductor?

"*A.* No, sir.

"*Q.* When did you make that attempt to catch that handle with reference to the time you went off the car?

"*A.* As I stood there ready to get off.

"*Q.* Had you been standing there a long time?

"*A.* No, sir.

"*Q.* Where were you when you made that attempt to catch that handle, in the body of the car or in the vestibule?

"*A.* In the vestibule. I was right at the door of the vestibule, the handle was right at my right hand just as you step down on the steps. The handle I tried to take hold of is the one that is on the door of the vestibule that leads off to the ground.

"*Q.* You knew you couldn't get off that car until it came to a stop, didn't you?

"*A.* Yes, sir.

"*Q.* And you also knew that these electric cars stopped quickly, didn't you?

"*A.* Yes, sir.

"*Q.* Because you had been on them—isn't that true?

"*A.* Yes.

"*Q.* You knew that they get under speed quicker than a steam car?

"*A.* Yes.

"*Q.* You knew all these things at that time, didn't you?

"*A.* Yes, sir.

"*Q.* Still you went toward the rear end of that car?

"*A.* Yes, sir.

"*Q.* And you knew the conductor was going to stop the car for you?

"*A.* Yes, sir.

"*Q.* I say was there anything preventing you from staying there in the center of the car until the car stopped again?

"*A.* I asked the conductor if he would let me off. When I got back into the vestibule of the car, I asked the conductor to let us off. I cannot say whether there were other people in the vestibule of the car at that time or not. The next thing I remember after speaking to the conductor in the vestibule of the car was when I was picked up by the pole."

In reply to questions by the court, plaintiff testified:

"*Q.* Then had you gained your equilibrium or possession of yourself so that you were walking as you went down and approached the conductor?

"*A.* Yes, sir.

"*Q.* You stated yesterday that you had been on the cars a great many times. Can you tell me how the starting of that car, how its effect upon you, this jerking compared with the usual effect when those cars start when you are in the aisle, or was it about the same or different?

"*A.* Well, a little quicker.

"*Q.* I understand you to say that you gained control of yourself before you got out to where the conductor was?
"*A.* Yes, sir."

The motorman, called by plaintiff, testified:

" I remember of being on the car on October 8th that was scheduled to leave Battle Creek at 8:15 in the evening. I made the regular stop at Urbandale. I heard the bells to go ahead. Then I received the short bells for a quick stop. * * * After I stopped there at the ordinary signal, I received the bells to go ahead, and I went ahead, as usual, about a car length, when I received bells to stop again.

"*Q.* What sort of signal was that?
"*A.* One bell and a pause and another bell—quick bells.
"*Q.* What do you call them?
"*A.* That is the 'short stop,' as we call it on the line, or a quick stop, not an emergency stop.
"*Q.* When you received that short stop signal, what did you do?
"*A.* I shut off my current, and applied my air."

Plaintiff made a motion for a new trial; but, as the record does not disclose that any exception was taken to the decision of the circuit judge refusing to grant the same, the assignment of error in overruling the motion has no foundation. We agree with the trial judge that the plaintiff did not establish any negligence on the part of defendant's employés in stopping the car at her request. *Conroy* v. *Railway*, 139 Mich. 173.

The judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.